Regina A. WRIGHT, Benjamin Wright, b/n/f Regina Wright, and Virgil Wright, Appellants (Plaintiffs Below)

v.

The INTERNATIONAL HARVESTER COMPANY, INC., Wright Brothers Contracting Company, Inc., Kenneth Wright and Karen Wright, Appellees (Defendants Below).

No. 29A02–8707–CV–286.

Court of Appeals of Indiana, Second District.

Sept. 27, 1988.
Rehearing Denied Dec. 16, 1988.

Gary P. Price, Lewis, Kappes, Fuller & Eads, Indianapolis, John S. Pearce, Pearce & Howard, Noblesville, for appellants.

Jim A. O'Neal, Ann M. Cassidy, Ice, Miller, Donadio & Ryan, Indianapolis, for appellees.

SHIELDS, Presiding Judge.

Plaintiffs Virgil, Regina, and Benjamin Wright brought suit against Karen and Kenneth Wright, Wright Brothers Contracting Company, Inc., and International Harvester to recover damages they suffered in an accident occurring on Ken and Karen's property involving a run-away International Harvester tractor. The trial court granted summary judgment in favor of Ken and Karen on Regina's claim and Regina appeals.

We reverse.

## FACTS

Regina Wright's husband, Virgil, was a salaried employee of a contracting company owned by his brother Ken Wright. Virgil worked both at the company shop and at Ken and Karen's home. Virgil's normal working hours were from 8:30 a.m. until 5:00 p.m. Regina worked for United Parcel Service and her starting time varied from 5:00 p.m. to 5:30 p.m. On the days when Regina and Virgil both worked, Regina customarily took their children, seven-year-old Rusty and five-year-old Benjamin, to Virgil's workplace, whether at Ken and Karen's house or the company shop, at approximately 4:45 p.m. Virgil would watch the children until his work was done.

On the day of the accident, Virgil was working at Ken's house, located near Eagle Creek Reservoir. He was constructing steps on the hill leading down to the reservoir by joining railroad ties and filling them with brick. Virgil used Ken's tractor to transport rakes and shovels up and down the hill. Virgil customarily would park the tractor on a flat surface, either at the bottom of the hill or at the top of the hill. However, on that day, Virgil parked the tractor on the hill, midway between the crest and the reservoir. He backed it up beside the spot where he was working, turned it off, and left it in gear. He did not see a parking brake, so he piled dirt up in front of the wheels to "chock" them and prevent the tractor from rolling down the hill.

About 2:30 p.m. Regina, her mother-in-law, and the two children arrived at Ken and Karen's home. Regina's mother-in-law drove Regina and the children to Ken's and then was going to drive Regina to pick up Regina's car where it was being serviced. Regina was then going to drive her own car to work. The accident occurred five to ten minutes after their arrival.

At the time of the accident, Regina, her mother-in-law, and Ken were standing at the top of the hill engaged in conversation. Virgil was standing on the hill, near the tractor. While nobody was watching, Benjamin mounted the tractor and moved the gear-shift lever out of gear. The tractor

began to roll down the hill toward the reservoir.

When Regina saw the tractor moving with her son on it she ran in front of it, positioning herself between the two front wheels, and stretching out her arms in an attempt to stop the tractor from continuing down the hill. She knew the tractor was six feet long, taller than her waist, weighed many times her own weight, that it was increasing in speed, and that it could seriously injure anyone in its path.

Meanwhile, Virgil got on the mower deck and held onto Benjamin. Virgil intended either to engage the brake to prevent the tractor from entering the water or to lift the child out of the seat. He was, however, distracted by Regina's presence in front of the tractor. Virgil and Ken yelled at Regina to get out of the way. As she jumped to the side of the tractor, the tractor ran over her ankle, causing the injury for which she has sued. The tractor proceeded down the hill where it turned over onto the pier. Virgil pulled Benjamin from under the tractor as the pier collapsed.

Although Ken admitted he considered it dangerous to park the tractor on an incline as Virgil had parked it the day of the accident, Virgil had seen Ken park it that way on prior occasions. Ken had given Virgil's children rides on the tractor before the day of the accident and had told them to stay away from the tractor when it was running or moving.

Regina admitted she could see the tractor from where she was standing while talking to Ken and her mother-in-law at the top of the hill. Neither Regina nor Virgil had warned the children to stay away from the tractor. Regina and Virgil both acknowledge that, at the time of the accident, it was their responsibility to supervise and take care of their children while they were on Ken and Karen's property.

## ISSUES

1) Whether genuine issues of material fact exist as to Regina's status on Ken and Karen's premises;

2) Whether Ken and Karen may be held liable for Regina's injuries through application of the "rescue doctrine"; and

3) Whether Regina was contributorily negligent as a matter of law in engaging in an attempt to rescue her son from the runaway tractor?

## DISCUSSION

Regina's status on the premises is immaterial and, therefore, the existence of disputed facts concerning her status is inconsequential.

For a visitor to recover damages from a landowner for injuries sustained while on the homeowner's premises, there must be proof that the homeowner breached a duty owed to the visitor and that this breach proximately caused the visitor's injuries. The duty owed by a homeowner to a visitor depends upon the visitor's status, which depends upon the purpose of the visit at the time of the injury. *Mullins v. Easton* (1978), 176 Ind.App. 590, 376 N.E. 2d 1178. If the visitor has a purpose that is related to the occupant's pecuniary interest or advantage, an invitation to use the premises is inferred, and a duty of reasonable care is imposed on the occupant.

If, however, the visitor is on the premises for her own pleasure or convenience, the visitor is a licensee. *Fleisher v. Hebrew Orthodox Congregation* (1987), Ind.App., 504 N.E.2d 320; *Mullins v. Easton* (1978), 176 Ind.App. 590, 376 N.E.2d 1178. A homeowner's only duties to a licensee are to refrain from willfully or wantonly injuring the licensee, *Gadboury v. Ireland Road Grace Bretheren, Inc.* (1983), Ind., 446 N.E.2d 1310; *Great Atlantic & Pacific Tea Co. v. Wilson* (1980), Ind.App., 408 N.E.2d 144, and to warn the licensee of any latent danger on the premises of which the owner has knowledge. *Martin v. Shea* (1984), Ind., 463 N.E.2d 1092.

When this case is analyzed in the context of the duty owed by Ken and Karen to Regina, the trial court did not err in granting the motion for summary judgment. If Regina is an invitee, and Ken and

Karen owe her a duty of reasonable care pertaining to their premises, her act of placing herself in front of the moving tractor constitutes contributory negligence as a matter of law. If she is a licensee, her recovery is barred by the lack of any genuine issue of fact. There is no allegation that Ken and Karen willfully or wantonly injured Regina, and the facts unequivocally establish her injuries were caused by her contact with a patent hazard.

However, if the case is analyzed in the context of the duty owed by Karen and Ken to Benjamin, the trial court erred in its grant of summary judgment because a genuine issue of material fact exists as to Regina's status as a rescuer.

Regina argues, citing *Neal v. Home Builders* (1953), 232 Ind. 160, 111 N.E.2d 280,[1] that Ken and Karen breached the duty they owed Benjamin and, accordingly, may be held liable for the injuries Regina sustained in attempting to rescue him. Ken and Karen, also citing *Neal*, contend Benjamin is a licensee and that they did not breach the duty they owed him as a licensee.

*Neal* acknowledges:

The general rule is that no different or higher duty exists with respect to an infant trespasser than would exist in the case of an adult trespasser, so that ordinarily there is no duty toward an infant trespasser except to refrain from willful or wanton injury. Accordingly, it has been held that ordinarily there is no duty to anticipate the presence of infant trespassers, to keep a lookout for them, to guard against their intrusion, or to keep property in such safe, proper, or particular condition as not to endanger them if they trespass thereon. Infant trespassers ordinarily take the premises as they find them.

*Id.* at 170, 111 N.E.2d at 285–86 (quoting 65 C.J.S. *Negligence* § 27, at 450–51).

The *Neal* court then discussed exceptions to the general rule, one of which is relevant to the present case. A duty to use reasonable care is imposed upon "one who maintains something dangerous to children and so exposed that there is a likelihood of their coming in contract [sic] with, and being injured by * * * it, notwithstanding they may be trespassers," *Neal* at 172, 111 N.E.2d at 287 (quoting 65 C.J.S. *Negligence* § 28, at 453–54); *see also Wozniczka v. McKean* (1969), 144 Ind.App. 471, 247 N.E. 2d 215 ["a person exposing dangerous articles or instrumentalities on his premises in such a manner that children (licensees) are likely to come in contact therewith to their obvious danger should reasonably anticipate the injury that is likely to occur and is bound to take reasonable care to prevent it, . . . such duty may exist even though the dangerous article is not an attractive nuisance." *Id.* (quoting 65 C.J.S. *Negligence* § 63, at 779)].

Construing the evidence most favorably to Regina, a reasonable fact finder could conclude the instant situation fell within this exception. If so, Ken and Karen are incorrect in their assertion that they owed Benjamin a lesser duty than that of reasonable care. Consequently, Ken and Karen may be liable for Regina's injuries under the rescue doctrine if the fact finder concludes the operative facts exist to impose upon Ken and Karen the duty of reasonable care to Benjamin and if her claim is not barred, as a matter of law, by her contributory negligence. It is not.

The rescue doctrine is recited in *Neal* as follows: "One who has, through his own negligence, endangered the safety of another may be held liable for injuries sustained by a third person in attempting to save such other from injury." *Neal* 232 Ind. at 167, 111 N.E.2d at 284, (quoting 65 C.J.S. *Negligence* § 124 at 738.)[2] While the *Neal* court recognized the rescue doc-

---

1. In *Neal,* plaintiff sued for the wrongful death of his wife who was killed after falling astraddle exposed joists in a partially constructed dwelling house. The accident occurred as plaintiff's wife was attempting to rescue her youngest son from his position of peril on a stepladder.

2. The occurrence of the accident predates the effect of Indiana Comparative Fault legislation, IC 34–4–33–1 et seq. (Burns 1986). The legislation does not apply retroactively. *Koehn v. Devereaux* (1986), Ind.App., 495 N.E.2d 211, 215 *citing* P.L. 317–1983, SEC. 2.

trine, it does not discuss its effect on the defense of contributory negligence. In fact, there are no Indiana decisions with precedential value discussing the topic.[3] Nevertheless, the Restatement and the rationale contained in decisions of other jurisdictions provide the authoritative guidance needed to decide this question. A statement of the "rescue doctrine," as it pertains to contributory negligence, provides: "[i]t is not contributory negligence for a plaintiff to expose himself to danger in a reasonable effort to save a third person or the land or the chattels of himself or a third person from harm." RESTATEMENT (SECOND) OF TORTS § 472 (1965). "[T]he law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons." *Rodriguez v. New York State Thruway Authority* (1981), 82 A.D.2d 853, 440 N.Y. S.2d 49, 51 (quoting *Eckert v. Long Island R.R. Co.* (1871), 43 N.Y. 502.)

■■■ "The extent of the risk which the volunteer is justified in assuming under the circumstances increases in proportion to the imminence of the danger and the value to be realized from meeting the danger and attempting to remove or eliminate the hazard...." *Moravec v. Moravec* (1984), 216 Neb. 412, 343 N.W.2d 762, 764. *See also* RESTATEMENT (SECOND) OF TORTS § 472 comment a (1965).[4] Whether the rescuer acted reasonably in light of the emergency confronting him is generally a question of fact. *Rodriguez*, 440 N.Y.S.2d at 51.

Furthermore in the case of *Cote v. Palmer* (1940), 127 Conn. 321, 16 A.2d 595,[5] the mother of an eight-year-old child was struck by defendant's train when she ran across the track in an apparently useless attempt to stop the child from approaching an oncoming train from the path on the opposite side. In considering the contributory negligence of the mother, the court stated:

> In the situation before us we have, in the protective instinct of motherhood, one of the strongest incentives to the risk of life, the jury might reasonably conclude that there was imminent danger of death or serious bodily injury to the child and an instinctive reaction to that danger on the part of the mother; and, had the child actually come upon the track in the face of the approaching train, the mother would have barely failed to reach her before it would have been too late. That her sacrifice did not avail to stop the child before she reached the track, cannot be determined from the record; but even if that sacrifice in the ultimate proved unnecessary, that could not affect the decedent's rights, for they were to be determined upon the facts as she might reasonably have believed them to be. [citations omitted] It is true that there must have been a moment when a calm observer would have seen that she could not reach the child in time to protect her and that unless she immediately stopped she would be struck by the train, but her conduct is to be judged, not in the light of cold reason, but in view of the aroused emotions which would animate a mother situated as was the decedent, and of the lack of opportunity for deliberation and exercise of a cool judgment. [citations omitted] We cannot hold that, as a matter of law, the decedent's conduct was not that of a reasonably prudent person in like circumstances, using those words in the sense we have stated....

*Id.*, 16 A.2d at 599–560.

Accordingly, we cannot say as a matter of law that Regina's conduct was not that

**3.** There is one court of appeals decision, *Lambert v. Parrish* (1984), Ind.App., 467 N.E.2d 791, *vacated on other grounds* (1986), Ind., 492 N.E.2d 289, which discusses this topic.

**4.** RESTATEMENT (SECOND) OF TORTS § 472 comment a reads, in part,

Whether a plaintiff is acting reasonably in exposing himself to a particular risk in order to protect a third person from harm depends upon the comparison between the extent of the risk and the gain to be realized by encountering it, which includes two things: first, the likelihood that the rescue will be successful and second, the gravity of the peril in which the third person has been placed.

**5.** *Cote v. Palmer* (1940), 127 Conn. 321, 16 A.2d 595 adopted the rescue doctrine in Connecticut.

of a reasonably prudent person in like circumstances.[6] Therefore, the judgment of the trial court is reversed and cause remanded for further proceedings.

RATLIFF, C.J., and SULLIVAN, J., concur.

---

**6.** A question of fact also exists concerning whether Regina may avail herself of the rescue doctrine. According to the RESTATEMENT (SECOND) OF TORTS § 472 comment a:

"[I]f the third person's peril is due in part to the plaintiff's own negligence, such negligence is a contributing factor in producing any harm which he sustains in attempting to rescue the third person and, therefore, is a bar to his recovery against a defendant whose negligence also contributed to such harm."

The facts indicate that Regina may be considered negligent in failing to supervise Benjamin while she remained on Ken and Karen's property. Therefore, Regina's negligence may have been a contributing factor in producing the injury she sustained in attempting to rescue Benjamin.